Morning, Your Honors. May it please the Court, Pete Patterson for the Fort Plaintiffs. I'm going to be splitting time with the Donk Plaintiffs. We're going to try to do 10 and 5, and I'd like to reserve two minutes for rebuttal if we can. The Governor's order is antithetical to the Second Amendment and should be enjoined. The order is premised on the notion that there is a crisis of violence in Albuquerque and Bernalillo County, and that is a time when the need for self-defense is most acute, not when it can be taken away. The Founders were familiar with areas that were particularly vulnerable, and what they did in those locations is that they didn't disarm people. Instead, they required people to be armed. So the Governor's order is directly contrary to the principles that underlie the Second Amendment. Well, Counselor, I'm a little confused. The District Court in another case, Springer v. Grisham, granted the preliminary injunction that you're now seeking on your behalf, but it's done, isn't it? It's not done because a preliminary injunction is just that, preliminary. Oh, I understand that. There's no guarantee it's going to last for the duration of our case. Well, but right now, you've got the relief you wanted in this other case. So if we granted your motion now, or your appeal now, what would it do? Well, one, it's going to guarantee that that stays in place for the duration of our litigation. Speak into the microphone a little bit. Oh, I'm sorry, Your Honor. Thank you. One, it's going to guarantee that it stays in place for the duration of our litigation. And two, it's not clear that that injunction covers us. Springer is an individual. There is one plaintiff in that case. The United States Supreme Court recently vacated an injunction in Labrador v. Poe to the extent it went beyond the named plaintiff in a case because it wasn't necessary to give him a relief. And so it's not clear that perhaps that injunction does cover us now. But even if it does, that could be a weakness in the injunction that could render us not protected at some point by that injunction. Did you make that particular argument in your supplemental brief? Well, we noted in the supplemental brief that it could be, there were issues with the injunction that could cause it to be narrowed, including that it purports to enjoin the order and not the... Sure. You can move, et cetera. But did you make that specific argument that you began with in responding to Judge Kelly that this preliminary injunction in Springer related to an individual that wouldn't necessarily relate to your particular... We didn't make that specific argument. We made the argument that the injunction purports to enjoin the order itself rather than an official, which is not, you know, the normal form for an injunction. And this is related in that the order does not give clarity as to who the injunction protects. So, and this is similar to the Ninth Circuit and Eleventh Circuit cases that we've cited, which said despite nationwide injunctions, we're still going to enter an injunction on behalf or consider entering an injunction on behalf of the plaintiffs in the case before us. What about redressability here? Yes. Because from what I can tell, any place in Bernalillo County that you're covering already has an ordinance, some legal prohibition against carrying a firearm in those places. Yes, Your Honor. So the first answer on that is that the New Mexico Constitution preempts local firearm laws. And there's a New Mexico Supreme Court decision, BACA, that says that this bars concealed carry bans in localities. Don't you have to get that resolved before you seek relief in federal court? We don't have to get it resolved. And this is a distinction between the cases the other side cites, in that in all those cases, redressability was dependent on, or most of them, was dependent upon actions of a third party, whether the cockfighting market would come back, whether somebody would contract with them, whether an employer would impose a vaccine mandate here. If this order is enjoined, our clients, they don't have to rely on anybody else. Fort has said he would carry if this order was enjoined, so that would redress the harm. He would. He said he would. He said he would, if this order were enjoined, notwithstanding any other local jurisdictions. And Smith and Donk have both said they're still carrying now, despite the fact that this order is in place. So the harm that they're facing is... But we would have to, to accept your argument, we would have to make our own determination of New Mexico constitutional law, would we not? You wouldn't have to. I would submit that the New Mexico Supreme Court has already resolved this, and we've got an attorney general letter saying that a location-specific ordinance couldn't stand. The court hadn't ruled. So I think it's straightforward. But you would not have to, because again, you don't have to redress all of our injury, every potential injury that we've had, our clients have said, if this order is enjoined, we will carry. And so that means that the injury we are facing from the governor's order will be redressed by what this court does. Maybe we will face some other potential injuries. We don't think so, due to the New Mexico constitution. But this court does not have to make that determination in order to rule in our favor. And so briefly, touching on the merits, I would like to say the governor overwhelmingly relies on municipal park regulations from the late 18th century to support the order. First of all, those had nothing to do with an emergency circumstance. New Mexico is fine generally with areas and parks. The premise here is that we're having an epidemic of violence. As I said, there's no principle in history that would allow bar and carry in that circumstance. But even putting that to the side, these are too little and too late. Our submission is that the date is set in 1791, as you know, but even if it were 1868, there are only three of these municipal regulations by 1868. And also, what is important is that Bruin teaches you have to look at why these regulations are in place. The governor has not explained why these park regulations are in place. Even if they assert they're a dead ringer, that doesn't matter. Bruin said, assumed for sake of argument, there were some handgun carry bans in colonial times, but they said those were because handguns were dangerous than usual weapons then. They're not now. So we have to know the why. And if we look at the why in these parks, it readily becomes apparent that these parks are a departure from our national traditions, not something that we should be drawing constitutional values from. These were an effort to create idyllic, rural, aristocratic type spaces within cities. And you can see that from the regulations that were in place in these parks, such as no ball playing, no musical instruments, no walking on the grass outside of the lawns, no indecent language, and yes, no firearms. But in context, what that indicates is that the worry was that people would be hunting or target shooting and thus disturbing the tranquility of these locations. This was not about public safety. And then the Shiler source that the governor cites says that when Prospect Park in Brooklyn was being made in this mold, Olmstead urged them to purchase an adjoining parcel for another park that would allow active recreation, including military training exercises. So these parks were essentially, if you would look at it in the First Amendment context, a time, place, and manner sort of regulation for putting activities in various places. But it's just apparent that this is not something we should be drawing our tradition of firearm regulation from, even if it were not too late. And I will pass the time on to my co-counsel, so hopefully we can reserve a few minutes for rebuttal. Thank you. Good morning, Your Honors. Anthony Napolitano for Appellants Gun Owners of America, Gun Owners Foundation, and Randy Donk. May it please the Court, I intend to specifically address the issues of playgrounds as affected by the New Mexico Public Health Order and the Donk plaintiff's departure from the other plaintiffs. And in footnote 7, the assertion of the Supreme Court has not ruled that any place is conclusively a sensitive place. The Court merely discusses that possibility in dicta, and the rules of the court. In Heller? In Heller and in Bruin, Your Honors. Well, yeah, and in Heller, which you refer to as dicta, with regard to government buildings and schools, Judge Abell, speaking for a unanimous panel in a published opinion, held that the dicta for government buildings does bind our panel, because we are typically considered ourselves bound as much by Supreme Court dicta as much as holdings. So why doesn't Bonady's prescription for binding us to the dicta on government buildings bind us also to the Heller dicta on schools? Your Honor, the ultimate problem here is that Heller did not address the states, and so I would distinguish that on those grounds. Also, simply put, the Supreme Court announced in later... So it doesn't, would you say it doesn't affect the states? Correct, Your Honor, Heller addressed the federal government, but not the states. Yeah, but in both Bruin and McDonald, the Supreme Court specifically held that the scope of the Second Amendment and the incorporation into the due process closure to the Fourteenth Amendment are identical. So why does the reference to federal government or states matter since they're identical? Because of the new analysis, the historical analysis set out in Bruin, which was not addressed in Heller, that specifically laid out there must be a historical analog for the regulation. The Supreme Court has since then not addressed the issue of schools. In fact, in Bruin, the majority opinion referenced the Friedman schools where teachers were armed, and it addresses that approvingly. So we can see that there's an analysis there that is yet to be done, and nevertheless, schools in particular, while the government side does try to analogize those to playgrounds, playgrounds and schools are not synonymous. One could say that they have the exact same relationship between playgrounds and cafeterias, right? Some cafeterias are in schools, some are not. Some playgrounds are in schools, some may be, and it's hard to tell from this order, and I do believe this is one of the specific issues that Springer did not address, and that does not moot out this case, is the order is applied to playgrounds. But playgrounds for kids, and from what your co-counsel was talking about before, kids don't, and we wouldn't want them to carry guns to protect themselves there. So we would, that would be a rationale for keeping guns totally out of premises connected with schools. Would it not? No, you're wrong. You don't think it makes a difference that we're talking about kids here, where kids play and are active? Your Honor, this is not a case about whether people under the age of 18 can carry a firearm. This is really a case about whether people, including individuals such as my client, who's a concealed carry permit holder, may be barred from choosing to protect his family when he takes them to a playground. Schools also differ from playgrounds in that at schools, the school or the government is in loco parentis authority and responsibility over the students. Would that make a difference to how the playground is being used if it's for school activity, for a football practice or something like that? Would that make a difference? Because then wouldn't you have to say that the school is in loco parentis for the athletes? One could assume so, and in that case we would have to look at historical analogs from 1791 where they're about and see that in those cases the regulations were only on the students, not on faculty or visitors to the school, because that in loco parentis authority does not exist. And further, to have the playgrounds addressed, we don't even have a clear picture on where playground ends, meaning a McDonald's play place, a slide and swing set provided for in a private shopping center or in a mall. Would those count as a playground under this order? And those have nothing to do with schools. I'd like to reserve the rest of the time if that's all right, Your Honor. Good morning, and may it please the Court, I'm Janet Carter representing Defendants Appellees. This Court does not have... Excuse me? Do you concede that these local ordinances are unconstitutional under the New Mexico Constitution? Do I concede that the local ordinances are unconstitutional? No. I'm here representing the Defendants Appellees, not the local entities who are the ones responsible. Right, but this is relevant to standing and redressability. Well, would you address redressability to start with, or are you arguing that they lack standing because they can't get redress? Yes, they do lack standing because they have not established redressability. And the reason for that is that each of the parts in which they wish to carry are also covered by a separate local ordinance. Now, as your question goes to, they do argue that those ordinances are unconstitutional under the state constitution, but I don't think it's appropriate for them to come to this Court asking this Court to answer a hypothetical question of state law when they've decided not to challenge those state ordinances that they say separate, that they acknowledge separately prohibit their conduct in state court. There seems to be something inconsistent in the government's position there, because if they are constitutional, it's hard to see what the purpose of this emergency order is. Emergency order just duplicates what's already local law. And so you can't say it's necessary to have an emergency order at the same time as you're saying these local laws prohibit the same thing. I think this is just the political judgment that is reserved to the Democratic branches of determining what is the best way to protect the people of Albuquerque and Benalio County. And the judgment was made that having a state-level order in place was important. I don't think any judgment was made in that, that separate ordinances were unconstitutional. But those ordinances are in place, and under this Court's decision in Valdez, as well as the decisions from other circuits in cases like White and the exotic animals case from the Second Circuit, that means that there isn't redressability in this case. Does it matter that the penalties may be different? For example, hypothetically, let's say the ordinance says at Park X that if you are found carrying a firearm, you are subject to a $25 fine. The government's emergency order, hypothetically, says if you are found with a firearm at Park X, you are subject to imprisonment for up to one year, a fine of $100,000, and a lifetime ban on voting. Does it matter that the individual may have absolutely no concern about paying a $25 fine, may have no concern about being found in violation of the ordinance, but may very well object to the extraordinary penalties under my hypothetical emergency order? So I don't want to fight the hypo, but I do want to start out by saying that I think the inverse is the case here. I think it's clear that the penalties for the unchallenged local ordinances are actually stricter than the governor's order. But even if that weren't the case, the law presumes that an order is enforceable, that a law that is in place will be enforced. That's the Consumer Data Association case. And these plaintiffs are here alleging that they are law-abiding individuals. I mean, they've declared that in their, put that in their declarations. So I don't think that it is appropriate to say that they just intend to violate those laws at the same time they're saying that they're law-abiding individuals. So I think that's why there isn't redressability in this case. I also agree that the case is moot, or at least the appeal is moot, not the case. The appeal is moot as to the powers prohibition because of the separate injunction that is in place in Springer. It is not the case that that is limited to Mr. Springer. In fact, the defendants in that case asked the court to clarify that it was limited to Mr. Springer. And the court said, no, it is clear that that does cover these plaintiffs. And that moots the relief that they're trying to seek. If I may speak to the merits quickly. In our view, there are at least three reasons why plaintiffs are not likely to succeed on the merits. Very briefly, there are well over 100 historical laws specifically prohibiting guns in parks. And those make clear that the governor's prohibition sits firmly within this nation's historical tradition of firearms regulation and within what Rahimi called the principles that underpin our regulatory tradition. Assuming we consider 19th century regulations, correct? Yes. So to be sure, the Supreme Court has not resolved this very complicated technical issue of whether 1791 or 1868 is the central focus of the originalism. How could it possibly? Now, you take the interesting position in your brief that we don't consider 1791. We only consider 1868, both for the Second Amendment and incorporation into the Due Process Clause. Other circuits have said you consider both 1791 and 1868. Now, I'm not questioning your position, but how can we consider both 1791 and 1868 if Bruin and McDonald said that the extent of the Second Amendment and incorporation into the Due Process Clause are identical? In other words, if we have the exact same emergency order that is evaluated, say, under your view in 1868, but we have a federal statute that does exactly the same thing, hypothetically, then we would not consider these historical analogs that you're asking us to consider for the 19th century, and we would be circumscribed by 1791, and it would be impossible then to harmonize into McDonald and Bruin where we have the exact same scope for those two rights. So I think these very difficult questions about the conflict really only, sorry, about the two different time periods, really only matter in cases where there is an actual conflict between the understanding at 1791 and the understanding at 1868, and that is absolutely not the case here. We have this enormous body of laws starting in 1858, and there is nothing at any point in history saying that anyone ever thought that it was unconstitutional to carry guns in parks. Now, Bruin was a very different situation because Bruin involved a challenge to a New York law that functioned as a complete prohibition on ordinary people with ordinary self-defense needs from carrying guns in public at all. And so what the Supreme Court found was that there was an overwhelming weight of other evidence from the 18th and 19th centuries that shows us that there was some right to carry outside the home. Here we don't have that. Now, plaintiffs say that they do have contrary evidence because they say that Boston Common and similar grazing areas from the Fountain were parks, and they found any prohibitions on guns in places like Boston Common. That means prohibitions must have been unconstitutional. But they're wrong on both parts of that. First, Boston Common was not a park. The Second Circuit, the Ninth Circuit, district courts in Maryland and Virginia have all concluded that it was not a park. Parks emerged in the middle of the 19th century with Central Park as the paradigm example. It's a factual issue or a legal issue, because it's really not either one. It's a historical issue. But how do we pigeonhole that into either a factual or legal issue? You argue that Boston Commons in 1791 was just there for grazing. They argue, you point to historical sources that say that it was not only used for grazing for animals, but also for a source of recreation. You know, I'm not a historian. But how do I decide which one of you are right? Do I just look at your historical sources and decide, yeah, I think it was also used for recreation? Well, I don't think it's a question of whether it might also have had some incidental use for recreation, just as, you know, children might use an empty lot to play in that just because there is some recreation going on does not make a place a park. But to answer your question of whether it's a legal or a factual issue, I think it's best understood as a question of legislative fact, which is one where this court can look at more evidence than with respect to the kind of factual questions of adjudicative fact. And indeed, if you do look at the sources that the plaintiffs have put in, for example, the Beamish article and the Walls article, their own articles acknowledge that parks emerged in the middle of the 19th century. The Beamish article refers to Boston Common. The article is called Before Parks and refers to Boston Common as a pre-park landscape. So I think the only fair reading is that those earlier spaces were not parks. But even if you disagree with me on that, even if they were parks, I think the even more important point is that plaintiff's argument is that the absence of legislation necessarily means unconstitutionality. And that is absolutely not the case. It is a premise of our federalist system that governments can regulate as they please, according to local needs and depending on policy choices within constitutional limits. It has never been the case that a government has to legislate up to the constitutional ceiling or else we'll lose the ability to legislate. That was what Mrs. Barrett- Assuming that's correct, and assuming that the contemporary phenomenon of a park wasn't developed until the mid-19th century, don't we know from both Bruin and Rahimi that then the question is not whether in 1858 guns were allowed in parks, it's whether or not in historical analog, under their view, if we look at 1791, in 1791 there was an appropriate historical analog, and you argue that they were sensitive places, right, that parks were similar to schools, similar to places like that. So isn't that really the analysis, whether or not guns were typically allowed in 1791 if we use their historical benchmark for firearms? Well, I think this question goes to the issue of looking at the whole span of history. And Rahimi instructs us to look for the principles that underpin our regulatory tradition. The principle here is the principle, as Justice Barrett put it in her concurring opinion in Rahimi, of the principle that she called it the sensitive places principle that limits the right to public carry. So that's the broad principle- So if we look at 1791, what sensitive places did allow wholesale bans on firearms? Well, Heller tells us that schools- All right, schools, then, so in 1791 we had Virginia, we had some guy who wrote that he thought the common law in England allowed firearms, which was never enacted in North Carolina. So we've got Virginia. And then we have the fact that in 1791 the whole idea of banning firearms was limited to students. You haven't produced any historical evidence, I don't think, that schools historically in the 18th century banned firearms for anybody other than students, and that was under a theory of in loco parentis. Well, as Your Honor said, I think this question is already resolved in Bonnerdy because when the Supreme Court said in Heller that its decision was casting no doubt on prohibitions on guns in schools and government buildings, it didn't say it was casting no doubt on prohibiting children from having guns in schools. Well, did Heller dicta actually say that firearms were completely banned in both government buildings and schools? I thought Heller's dicta only referred to the fact that schools and government buildings could be regarded as sensitive places that would facilitate regulations on the possession of firearms. It said that, I mean, I can read it. I have it here.  Nothing in our opinion should be taken to dust, cast doubt on, and then another phrase, laws forbidding the carrying of firearms in sensitive places such as schools and government buildings. So I think that's an absolutely unambiguous and universal prohibition. And as Your Honor said, when the question came up in Bonnerdy of whether that is binding on this court, the court said, yes, it is. And it rested that solely on that historical proposition from Heller in this part of the opinion. It did not look at intermediate scrutiny in this part, and therefore nothing in Bruin, let alone Rahimi, disturbs it. Let me ask a question, if I may. How do you respond to the argument by opposing counsel that the parks where there were prohibitions on firearms were special parks where you couldn't even use bad language? How do you respond to that factually? I mean, these were all of the parks. The parks first emerged in the middle of the 19th century. Central Park was the first, then Prospect Park, then Fairmount Park. They spread all across the country. And these were parks for the people. They had rules, but all parks have rules. And one of those rules was no carrying firearms in the park. They were absolute. They were not, as plaintiffs suggest, targeted specifically at a certain kind of conduct with respect to firearms. It was an absolute flat prohibition on carrying firearms. And that tradition reflects the longstanding principle, as Rahimi said, and as Justice Barrett said in her concurring opinion, that the people may choose to prohibit guns consistently with the Second Amendment in sensitive places. And this 19th century evidence shows that parks are one of the places that people decided were sensitive places where guns should be prohibited. I interrupted you. If you have another point, you can state it very quickly. No? No. Very good. Thank you very much. Thank you, Your Honor. And I have five points, so I'm going to try to talk fast. So first, with respect to Vonnity, I think that Bruin elaborated on Heller, and it said that it identified three specific government buildings. So it's certainly a refinement in that respect. And then it also said you can reason by analogy from those three locations. Well, on the three, though, it prefaced it by the signal EG. Well, okay, there could be more, but it didn't have, it could have just said government buildings. It said these three specific. And then it said you have to reason by analogy, which means you have to do the how and the why. And so it just is not consistent with Heller and Bruin to say, okay, government building, that's it. So undermine that. And with respect to the schools, the how and the why, it's clear it's because these students, it was students that were restricted, and the why was in local parental authority. And that certainly does not apply in parks and playgrounds. And certainly at a time of rising alleged criminality, the government, it's not like when you drop your child off and the government takes responsibility for the school's protection. Our clients are responsible for their own family's protection in these locations. The 1791, 1868, you're absolutely right, Your Honor. It has to be the same for both. The Supreme Court has held that. The only dispute is whether it's going to be 1791 for both or 1868 for both. And our submission is it makes much more sense. 1791, that's when the right was adopted. 1868 expanded the scope as to who the right applied, but it didn't change the right itself. With respect to Boston Common and its status at the founding, their own source says it was the rallying ground for all public meetings, parades, picnics, celebrations, and sports for the children even before the Revolution. And the same source said that nearly all of the New England towns and square, generally consisting of from five to ten acres, was laid out on public ground. So maybe there's a semantic. Were these parks? I don't know, but they were places for public recreation. With respect to the founding era evidence, the 1786 Virginia law was one that you mentioned. And I think that law is actually very important. Bruin said it practically codified the common law, which means generally applicable law. And there are two parts of it. One said you could be barred from carrying in a terrifying manner in fairs and markets and other places. But the first part said that you can't bring guns into courts except for the judges and those assisting them. So what that shows is that there were certain places, yes, were sensitive, but those were places where the government took on the burden of protection. Thank you. Cases submitted. Counselor excused.